## Pittsburg Steel Foundry, Appellant, *v.* Pittsburg Steel Company.

*Contract—Sale—Rescission of contract—Damages.*

In an action of assumpsit on a contract, it appeared that plaintiff, a corporation, manufactured steel ingots, and that the defendant, also a corporation, rolled ingots into billets. Under the contract in suit, the plaintiff was to erect furnaces to make steel ingots for defendant, and estimated to cost $25,000. Ingots were to be delivered to the defendant from time to time in sufficient quantities to enable it to operate a twenty-

inch mill. The quantity was not to exceed 100 tons per day. It was agreed that the plaintiffs should be paid for the ingots fifteen per cent profit on the actual cost of materials, labor and repairs in making the steel, and the defendant guaranteed that the amount of profits which should accrue to the plaintiff should not be less than $50,000 for the period of two years during which the contract was to run. It was further provided that the defendant should make payments on the twentieth of each month for all steel delivered during the preceding month. The defendant further reserved the right to cancel the contract at any time upon paying to the plaintiff such a sum as with the profits then accruing, to plaintiff, would equal the sum of $25,000, being the estimated cost of the investment, plus a bonus of $25,000 for the privilege of cancellation. Plaintiff erected its mill and for three months delivered all the ingots which the defendant required for its use. Plaintiff purchased raw materials at the instance and request of defendant in advance of the immediate need for manufacturing purposes. Towards the end of the second month the defendant made a demand for ingots in quantities greater than it could use. To this the plaintiff replied that, "although you do not need the ingots which you have seen fit to order in pretended compliance with your contract, we hold ourselves in readiness to continue deliveries until notified by you to stop, and will also look to you for full performance of your part of the contract." Subsequently the defendant refused to make a monthly payment, and also refused to accept ingots, and thereafter plaintiff made no further deliveries. *Held* (1), that the plaintiff had done nothing to waive its rights under the contract, and that it promptly and properly objected when defendant demanded more ingots than it could use, or was entitled to under the contract; (2) that the plaintiff was entitled to recover an amount sufficient to make good the loss upon the raw materials purchased for the benefit of the defendant and at its suggestion; (3) that the defendant by its refusal to accept and pay for ingots delivered to it in accordance with the contract, brought it to an end without fault on the part of the plaintiff; and (4) that plaintiff was not entitled to recover both the profits and the cost of the plant, inasmuch as the cost of the plant was one of the elements which the profits agreed upon were to cover and replace.

Argued Oct. 29, 1908. Appeal, No. 188, Oct. T., 1908, by plaintiff, from judgment of C. P. No. 2, Allegheny Co., July T., 1902, No. 392, on verdict for plaintiff on case tried by the court without a jury in suit of The Pittsburg Steel Foundry v. The Pittsburg Steel Company. Before FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Reversed.

Assumpsit for breach of contract.

By agreement of the parties the case was tried by SHAFER, J., without a jury.

From the record it appeared that the contract for the breach of which suit was brought, was as follows:

"Agreement made this 30th day of June, 1899, by and between The Pittsburg Steel Foundry, a corporation under the Laws of the State of Pennsylvania, party of the first part.

"And W. C. Reitz, of Pittsburg, Pennsylvania, who signs this contract on behalf of The Pittsburg Steel Hoop Company, which latter Company is now applying for its charter and will be incorporated and organized on or before July 15th, 1899, and when so organized and when it has signed this contract making itself liable from the beginning hereunder, is to be substituted for said W. C. Reitz, party of the second part hereto, witnesseth:

"The first party is erecting its plant at Glassport, Pennsylvania, and proposes to so construct its works or a part of them as to enable it to furnish to the second party open hearth steel ingots for the use of the second party and for such purpose the first party will make a special investment in laying down and erecting open hearth furnaces, the estimated cost of which as the basis of this contract is $25,000.

"The first party is to make all open hearth steel ingots required for use by the second party, not to exceed 100 tons per day.

"The ingots are to be 6 in. by 6 in. and are to be delivered at the first party's works on cars provided by the second party.

"The deliveries are to commence about Oct. 1st, 1899, and are to continue for two years from date of commencement of the deliveries.

"The quality of the steel is to be tensile strength not less than 60,000 lbs. to the square inch; carbon from .10 to .12 per cent. phos. not to exceed .08.

"The cost of the steel is to be 15 per cent. profit on the actual cost of the materials, labor, fuel and repairs in the making of the steel, being the actual mill cost, exclusive of interest on investments, taxes assessed and other general managerial expenses of the first party. This cost is to be agreed upon from

time to time by an authorized representative of each of the companies to the contract, and if those representatives cannot agree, they shall select a third person, whose decision shall be final and conclusive upon both parties to the agreement.

"The second party shall make payments on the 20th of each month for all steel delivered during the preceding calendar month.

"The second party guarantees to the first party that the amount of profit which shall accrue to the first party under this agreement during the two years, in case it is not cancelled in the meantime as hereinafter provided, shall be not less than $50,000. The second party, however, reserves the right to cancel this agreement by paying to the first party such sum as with the profits then accrued to the first party under the contract on steel already delivered will equal the sum of $25,000 or the estimated cost of its investment, and in addition thereto the second party shall pay as a bonus to the first party for the privilege of cancellation, the sum of $25,000."

Other facts appear by the opinion of the Supreme Court.

*Errors assigned* were in overruling plaintiff's exceptions to the adjudication, quoting them.

*John M. Freeman*, with him *D. T. Watson* and *Harry F. Stambaugh*, for appellant.—The facts as found by the court show that the plaintiff actually delivered to defendant during the months of January, February and March, 1901, a quantity of ingots equal to, and for the month of March, in excess of, the quantity required by the defendant for use in operating its twenty-inch mill, and plaintiff was therefore not in default, and was entitled to recover damages for defendant's breach of contract: Wright's App., 99 Pa. 425; Diehl v. Adams County Mut. Ins. Co., 58 Pa. 443; Armstrong v. Coal & Iron Co., 48 Minn. 113 (49 N. W. Repr. 233).

But even if the plaintiff were in default in January, February and the early part of March (which it was not) the defendant waived such default by continuously insisting upon performance by the plaintiff, and continuing to hold the con-

tract obligatory upon both parties until March 18, 1901, when the plaintiff offered to comply with defendant's demand, if the latter would pay for the ingots already delivered: Pratt v. Mfg. Co., 115 Wis. 648 (92 N. W. Repr. 368); Robinson v. Ry. Co., 103 Mich. 607 (61 N. W. Repr. 1014).

It was perfectly apparent from the defendant's conduct in January, February and March, 1901, and long prior thereto that it had abandoned its contract and determined not to perform the same and that it was not acting in good faith in its demands for ingots, and did not intend to use them: Lake Shore, etc., Ry. Co. v. Richards, 152 Ill. 59 (38 N. E. Repr. 773); Armstrong v. Coal & Iron Co., 48 Minn. 113 (49 N. W. Repr. 233); Nichols v. Steel Co., 137 N. Y. 471 (33 N. E. Repr. 561).

The defendant was guilty of the first breach of the contract, and was, therefore, responsible for any default on the part of the plaintiff which can reasonably be attributed to the default of the defendant: Anvil Mining Co. v. Humble, 153 U. S. 540 (14 Sup. Ct. Repr. 876).

The measure of plaintiff's damages includes the loss sustained on melting materials, the loss sustained on the two furnaces erected, and the profit guaranteed under the contract, as well as the cost of the ingots delivered: McElwee v. Bridgeport Land & Imp. Co., 54 Fed. Repr. 627.

Generally speaking, a demand of a greater sum than that which may be due is still a good demand, and it is the duty of the other party to pay what is due: Kimball v. Bellows, 13 N. H. 58; Marine Bank v. Fiske, 71 N. Y. 353; Hannan v. McNickle, 82 Cal. 122 (23 Pac. Repr. 271); Shirley v. Shattuck, 58 Mass. 470.

*Willis F. McCook*, with him *B. J. Jarrett*, for appellee.— Where one party to a contract annuls the contract for a stated reason, it cannot afterwards be permitted to shift this ground and say that whilst that reason was not a good one, it had the right to declare it off for some other reason. Such views of treating contract obligations will not be permitted: Railway Co. v. McCarthy, 96 U. S. 258.

OPINION BY MR. JUSTICE POTTER, January 21, 1909:

This was an action brought to recover the amount of an award, and also for damages for the breach of a contract. A jury was waived by agreement of the parties, and the case was heard by the court. It appears from the evidence, that the contract entered into between the plaintiff, the foundry company, and the defendant, the steel company, was an absolutely safe one in so far as the foundry company was concerned, provided it produced the steel ingots in the quantity and of the quality required. It ran no risk of loss, for it was to receive as compensation a profit of fifteen per cent on the actual cost of the materials, labor, fuel, etc., used in making the steel; and the steel company further guaranteed that the aggregate amount of profit which should thus accrue to the foundry company under the contract during the two years for which it was to run, should not be less than $50,000. Even in the event of cancellation, this much was to be secure; for while there was a provision under which the steel company reserved the right to cancel the agreement, it could only do so by paying to the foundry company such a sum as would, with the profit already made under the contract, on steel then delivered, equal the sum of $25,000, or the estimated cost of its investment in facilities for carrying out the contract; and in addition thereto the further sum of $25,000 as a bonus for the privilege of canceling the agreement. So that if it performed its duty, the foundry company was in any event assured of profits under the contract, amounting, at least, to the sum of $50,000, without the risk of loss. The plaintiff was to work substantially upon a percentage basis. The fact that the steel company was to pay the entire cost of all materials, and the cost of manufacturing them into steel, and a profit on the whole to the foundry company, gave to the defendant a vital interest in the securing of the raw materials as cheaply as possible.

The contract was made on June 30, 1899, and provided that deliveries of steel ingots to the defendant company were to commence about October 1 following. But neither the furnaces of the plaintiff company nor the mill of the defendant

company was ready for operation at that time. The defendant company, however, anticipated that the price of raw material would advance; and, as set forth in the ninth finding of fact by the trial judge, "On August 9, 1899, the defendant authorized the plaintiff to purchase 1,000 tons of scrap for use in producing ingots 'for our account,' and from that time until January or February, 1900, a large number of written communications passed between the parties in regard to the purchase of scrap and other melting materials, the defendant company stating that it would require 2,500 tons for each of three months beginning December, 1899, and saying to the plaintiff, 'You can purchase material to cover same to the best advantage.' In October the defendant company authorized the plaintiff to purchase for its account 9,000 tons of basic pig iron, which was bought by the plaintiff. The defendant also on the same day authorized the purchase of from 500 to 1,000 tons of scrap; and a large number of other communications of like import passed between the parties, and a considerable amount of melting material was purchased in accordance therewith, the whole amounting to some fifty or sixty thousand dollars worth, in addition to the 9,000 tons of pig iron, which appears to have been sold not long after its purchase."

There can be no question under the evidence, but that this raw material was all purchased, not only for the benefit of the defendant company, but with its approval, and nearly all of it upon its express request. And if the contract had been carried out, as was contemplated by both parties when it was made, this material would all have been used in the manufacture of ingots for the defendant company. In order to bear part of the burden of purchasing raw material in advance of its need for actual conversion into ingots, the defendant company advanced to the plaintiff the sum of $40,000. This amount would, in the natural course of the transaction, be used as a credit against the value of the ingots, as manufactured and delivered by the plaintiff; but it could make no great difference in the end, whether the money advanced was appropriated specifically to the cost of material or not. This

was only one of the elements with which the defendant company was properly chargeable under the contract; in addition thereto, as fast as the material was worked up, the cost of manufacture, fuel, etc., and the profit of fifteen per cent thereon, would all be chargeable to the defendant. So that, if the money advanced were applied to the credit of the general account the same result would in the end be reached. All would have gone smoothly no doubt between the parties, had it not been for the change in the market price of steel, which is shown in the twenty-first of plaintiff's requests for findings of fact, affirmed by the trial judge, and from which it appears, "That at the time the contract between the plaintiff and defendant was made in June, 1899, the market for steel was rapidly rising and continued to rise until about November, 1899, when it began to fall and continued to decline until beginning with June, 1900, and continuing until March, 1901; the defendant company could purchase open hearth steel billets in the market at an average cost of over twenty dollars per ton less than they were costing the defendant under this contract, when made from the high priced melting materials purchased by the plaintiff on orders of the defendant." In his opinion, the trial judge further says, "It is very apparent that considering the price of steel in the winter of 1901, it was very greatly to the advantage of the defendant to get rid of the contract, for the reason that it could buy steel at very much lower prices than its cost would be to it under the contract, and there is no apparent reason why the plaintiff should avoid the contract."

The court below found that the plaintiff was entitled to recover for the value of the ingots actually delivered by it, and which were found to be of such a character that they should have been accepted by the defendant. But he refused to allow for the loss on materials purchased by the plaintiff at the instance and request of the defendant, to be manufactured into ingots for it, and he also refused to allow as damages for the breaking of the contract, the minimum amount stipulated to be paid by the defendant company in case the contract should be canceled by it. The failure to award damages for the

breach of the contract seems to us inconsistent with the findings of fact, and with the construction of the contract as set forth in the first conclusion of law by the trial judge, in which he holds that: "The contract is not one for the delivery to the defendant of such an amount of steel ingots as it might choose to order up to one hundred tons a day, but it is only for the ingots required for its use, that is, all that it should use from time to time in operating its twenty-inch mill, which was the only way it could use them." We agree fully with this conclusion, and in a careful examination of the evidence, we find nothing therein to justify the suggestion that any change was ever made in the terms of the contract; nor do we find any support for the fourth and fifth conclusions of law reached by the trial judge wherein he holds that the plaintiff did not continue to stand upon the position that it was only obliged to furnish a supply of ingots sufficient to meet the capacity of defendant's mill. As we read the evidence, it does not appear that the plaintiff in any way waived its right under the contract to supply only such an amount of steel as defendant could use in its twenty-inch mill or did anything which would estop it from maintaining the position that it had delivered all the ingots which the defendant required for its use in the months of January, February and March, 1901. Our examination of the record satisfies us that the plaintiff did take and consistently maintain throughout the controversy the position that defendant was not entitled, under the contract, to the quantity of ingots demanded by it, although plaintiff did profess its willingness to supply all that were called for, if payment were made for what had been supplied. Such payment was never made. In its letter of February 21, referring to the defendant's demand for more ingots, plaintiff said: "We can only say that although you do not need the ingots which you have seen fit to order in pretended compliance with your contract, we hold ourselves in readiness to continue deliveries until notified by you to stop, and shall also look to you for full performance of your part of the contract."

This does not indicate a disposition to waive any of the terms of the contract; on the contrary, it shows readiness on

the part of plaintiff to fully comply therewith; and a determination to hold the defendant to its agreement. As the trial judge says elsewhere, there was no reason why the plaintiff should not have desired to carry out the contract for it was entirely favorable to it, and the larger the amount of ingots manufactured, the larger would be the profit. There was every reason on the part of the plaintiff to make the deliveries as large as possible. But when the defendant company refused to accept or pay for any of the ingots as delivered, the plaintiff could not reasonably be expected to continue the vain thing of furnishing ingots which were not being accepted. We regard the evidence as being entirely sufficient to show that the plaintiff did at the time raise the question that defendant did not need, and was not, under the terms of the contract, entitled to the quantity of ingots it was demanding. The third, fourth, seventh and eighth assignments of error are sustained.

We are also convinced by a very close examination of the evidence that there is no sound basis for the second, third and eighth conclusion of law in which the trial judge refuses to award to the plaintiff an amount sufficient to make good the loss upon the raw materials purchased for the benefit of the defendant company, and at its suggestion. It may be true that the plaintiff was not, under the strict terms of the contract, bound to purchase materials in advance of actual need for manufacture, and that it was not bound to follow the advice or obey the orders of defendant, as to such purchases. It might have pursued the hand to mouth policy, and saved to itself some risk and much trouble thereby. But beyond all question, its action in the purchase of materials was taken in the supposed interest of the defendant, and for the most part at its express direction, and the latter cannot now be permitted to disavow responsibility for the result. The purchase of all the materials in question, was made in order that they might be used under the contract for the manufacture of ingots for the defendant, and at its cost. The plaintiff, under the contract, had no concern as to the cost except to protect as best it could the interests of the defendant in the purchase of materials; and it was obviously

its duty to comply with the reasonable demands of the defendant in that respect. The evidence shows that it acted in entire good faith, and that it made every effort to protect the interest of the defendant company. The latter must therefore be held chargeable with the final loss which resulted from the disposition of the materials purchased at its request, and for its benefit. The first, second and fifth assignments of error are therefore sustained.

Counsel for appellant complain in the sixth assignment that the court below erred in overruling their exception to the ninth conclusion of law, which conclusion was as follows: "The plaintiff's bill of items includes a claim for the cost of the plant and also a claim for the profit guaranteed during the two years of the existence of the contract. We are quite unable to see how the plaintiff can claim both of these at the same time. It could only successfully claim the former by showing that the contract had been wrongfully brought to an end by the defendant without default on its own part, and a claim for the latter must be founded upon the performance of the contract. As neither of these events has happened we are of opinion that it cannot recover either of these items."

The latter part of this conclusion is not justified by the evidence, nor is it consistent with the construction of the contract by the court in its first conclusion of law, in which it was held that the obligation upon the plaintiff was to furnish only as many ingots as the defendant could use in its twenty-inch mill. The evidence shows that the plaintiff never failed to furnish at least that amount, and consequently it was never in default in that respect. The defendant company by its refusal to accept and pay for the ingots delivered to it in accordance with the contract, brought it to an end without fault upon the part of the plaintiff.

The trial judge was, however, entirely right in holding that the plaintiff could not recover both profits and cost of the plant. It was entitled to the profits stipulated for in the contract. But clearly, under the terms of the agreement, the cost of the plant was one of the elements which the profits agreed upon were to cover, and replace. The additional furnaces required

were estimated to cost $25,000, and this amount was to be made good out of the minimum profits for which provision was made.    The remainder of the guaranteed profits, an equal amount, was to go to plaintiff as a bonus for the cancellation of the contract.    Of course, the main inducement to the plaintiff in entering into the contract, was the prospect of the much larger profits which would ensue if the agreement should be carried out as contemplated by both parties at the time.    As we have already indicated, the evidence shows that the contract was brought to an end through no fault of the plaintiff, and it is therefore entitled to compensation in the first place for the ingots which it manufactured under the contract for the defendant company.    If we have correctly apprehended the finding of the court below in this respect, the price of the ingots delivered, and for which recovery was allowed, was $58,249.80, with interest from the date of the judgment, September 17, 1908.    This included a certain amount of profit which is stated by counsel for appellant as being $7,666.57.    Whatever this amount was, there should be allowed to plaintiff, in addition thereto, a sum sufficient to bring the total profits up to $50,000, the minimum amount stipulated in the contract.    This would apparently be the further sum of $42,333.43.    In addition to these items the plaintiff is entitled to be made whole for the loss sustained on the resale of the melting materials purchased by it at the direction of, and for the benefit of, the defendant company in the carrying out of the contract.    This is stated by counsel for appellant as being $24,423.18, with interest thereon from April 3, 1902.    From the sum of these items is to be deducted the amount of cash advanced in installments by the defendant company to the plaintiff, which in the aggregate was $40,000, with interest thereon from the dates of the payments.    The balance thus shown will be the amount to which the plaintiff company is justly entitled, and for which judgment in its favor should be entered.    This will only make good to the plaintiff the expenditures actually made by it under the contract for the purchase of raw materials required to enable it to carry out the agreement, and in addition will yield to it a clear bonus of $25,000 for the loss of the contract, as was con-

templated in the agreement, and will also replace substantially the amount expended by the plaintiff in the construction of the additional furnaces required for the purposes of the contract. The calculations necessary to liquidate the judgment in accordance with the views herein expressed, will be made under the approval of the court below.

The judgment is set aside, and it is ordered that the record be remitted, that judgment may be entered in favor of the plaintiff in accordance with this opinion.